IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

KRISTINA HARRELSON,                )
                                   )
            Plaintiff,             )   Case No. 05-157-KI
                                   )
      vs.                          )   OPINION AND ORDER
                                   )
JO ANNE B. BARNHART,               )
COMMISSIONER of Social Security,   )
                                   )
            Defendant.             )

      Alan Stuart Graf
      1020 S. W. Taylor Street, Suite 230
      Portland, Oregon 97205

           Attorney for Plaintiff

      Karin J. Immergut
      United States Attorney
      District of Oregon
      Neil J. Evans
      Assistant United States Attorney
      1000 S. W. Third Avenue, Suite 600
      Portland, Oregon 97204-2902

Page 1 - OPINION AND ORDER

      Stephanie R. Martz
      Special Assistant United States Attorney
      Office of the General Counsel
      Social Security Administration
      701 5th Avenue, Suite 2900 M/S 901
      Seattle, Washington 98104-7075

        Attorneys for Defendant

KING, Judge:

Plaintiff Kristina Harrelson brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for supplemental security income benefits ("SSI"). I affirm the decision of the Commissioner.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The claimant has the burden of proof on the first four steps. Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001); 20 C.F.R. §§ 404.1520 and 416.920. First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work which he or she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Bustamante, 262 F.3d at 954. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. It is more than a scintilla, but less than a preponderance, of the evidence. Id.

Even if the Commissioner's decision is supported by substantial evidence, it must be set aside if the proper legal standards were not applied in weighing the evidence and in making the decision. Id. The court must weigh both the evidence that supports and detracts from the Commissioner's decision. Id. "Under this standard, the commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Barnhart, 359 F.3d 1190, 1193 (9th Cir. 2003) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found that Harrelson had severe impairments of fibromyalgia, personality disorder with histrionic features, and an adjustment disorder, but that none were severe enough to

meet or equal one of the listed impairments. In determining Harrelson's residual functional capacity, the ALJ concluded that Harrelson's reports of extreme pain were not credible. The ALJ discounted the opinion of an examining psychologist, Dr. Eckstein. The ALJ limited Harrelson to light work with some nonexertional limitations. Based on the testimony of a vocational expert, the ALJ found that Harrelson could return to her past jobs of service station attendant, switchboard operator, or cashier in certain environments. Alternatively, the ALJ found that Harrelson could perform the jobs of telephone answering service operator, garment sorter, and home health aide. On these findings, the ALJ found that Harrelson was not disabled under the Act.

**FACTS**

Harrelson, who was 43 years old at the time of the decision, alleges that she became disabled on February 1, 2000 due to fibromyalgia, depression, carpal tunnel, and Raynaud's phenomena. Harrelson completed three and one-half years of college but did not receive a degree. She had worked in the past as a sales clerk, waitress, cook, service station attendant, switchboard operator, secretary, adult care provider, and cashier. She left her last job in February 2000 because she could not work the required days due to religious reasons.

Harrelson lives with her eight-year-old daughter, who also spends a lot of time with her father because Harrelson cannot entertain her. Harrelson dreads grocery shopping because it is uncomfortable for her to be on her feet for very long. She does the dishes once a day but is unable to do other housework because of the pain. At the time of the hearing, Harrelson no longer went to church because of the pain, was no longer active with hobbies like horses, motorcycles, skating and other outdoor activities, and no longer volunteers. Harrelson takes her

Page 5 - OPINION AND ORDER

daughter to a parenting class on Thursday nights that is operated through the daughter's school. Harrelson reads a lot for pleasure and listens to the radio. The only hobby she continues to do is needlepoint for 30 minutes a month.

Harrelson has difficulty functioning very well from the side effects of her narcotic pain medication, nausea and fatigue. At times, Harrelson's weight has dropped below 100 pounds although she is 5'5" tall. Her doctors attributed the weight loss to inadequate pain control. By August 2002, Harrelson's weight was up to 111 pounds and she was extremely happy that she was gaining weight. On May 23, 2003, she weighed 128 pounds. Harrelson complained at the hearing that when she wakes up in the morning, she feels "like the meat is just being ripped off [her] bones" and the pain medication makes her a zombie. Tr. 415-16. Harrelson is in constant pain when unmedicated and has been taking prescription narcotic pain medications for approximately three years prior to the hearing, including methadone and Norco at the time of the hearing. Harrelson started having heart palpitations in early 2002, which testing revealed to be non-sinister and requiring no treatment.

## DISCUSSION

I.   Subjective Pain Testimony

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must (1) produce objective medical evidence of one or more impairments; and (2) show that the impairment or combination of impairments could reasonably be expected to produce some degree of symptom. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The claimant is not required to produce objective medical evidence of the symptom itself, the severity of the symptom, or the

causal relationship between the medically determinable impairment and the symptom. The claimant is also not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. Id. at 1282. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. If there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if the ALJ makes specific findings stating clear and convincing reasons for the rejection, including which testimony is not credible and what facts in the record lead to that conclusion. Id. at 1284.

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

Harrelson contends that the ALJ improperly discredited her subjective symptom testimony. She first disputes the ALJ's reason that her description of extreme pain is inconsistent with her reports to her physicians.

Harrelson's physicians characterized her descriptions of pain as "overly dramatic," "over-reactive," and "dramatic." Tr. 130, 177, 278. By the time of the hearing, her weight returned to normal, which Harrelson's treating physician interpreted to mean that her pain was being better controlled, allowing her normal appetite to return. In August 2002, Harrelson reported that with medication, her pain is a 5/10, that she was happy to have the extra mobility with the pain medications, and that she was eating more since having the pain medications. Although there are chart notes of "pain like a knife" reported in September 2001, Tr. 138, that description was given

Page 7 - OPINION AND ORDER

when Harrelson's weight was down and she was on weaker medication. This reason is supported by substantial evidence.

Harrelson disputes the ALJ's note that no treating physician indicated that she is disabled. She points to the notation by Dr. Anderson on March 5, 2003. The chart note states:

> Kristina is in today for refills of her Norco, her methadone, and her Xanax. Appropriate refills given today. She has a fear of fibromyalgia with chronic pain therapy as described above. Also, some irritable bladder and will give her some Urispas 100 mg 3 times a day for 3 days. Chronic anxiety secondary to the problems above. She has had significant difficulty with her fibromyalgia for some period of time, which really is significantly disabling fore[ sic] her.

Tr. 328.

I do not interpret this use of the word "disabling," when read in context, to mean that Dr. Anderson believed that Harrelson was unable to work.

Harrelson disputes the ALJ's reliance on the questionable validity of the MMPI being consistent with lack of credibility.

Dr. Eckstein wrote:

> The validity scales profile of Ms. Harrelson's MMPI-2 data indicate some questionability in terms of the overall validity of her profile. This could indicate an attempt for Ms. Harrelson to present herself as more psychologically disturbed than is actually the case. Another hypothesis is that this testing represents an honest self-description seen by someone who is quite unconventional in her thoughts, feelings and behavior. She may be quite distressed and confused and thus be reporting a wide range of psychological symptoms. Because of her validity configuration, the following results are to be taken as tentative in nature.

Tr. 157.

I agree with Harrelson that Dr. Eckstein presented two possibilities concerning the validity profile and the ALJ chose to rely on the one which is inconsistent with lack of credibility, namely, that Harrelson presented herself as more psychologically disturbed than is the

case. I note, however, that the ALJ is entitled to draw this type of conclusion. "Under this standard, the commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Barnhart, 359 F.3d 1190, 1193 (9th Cir. 2003) (internal citations omitted). Here, the inference of lack of credibility is reasonably drawn from the test result, as interpreted by Dr. Eckstein. Thus, the ALJ's reason is valid.

Harrelson disputes the ALJ's reasoning contrasting her statement on November 14, 2002 that she could hardly get out of bed with Dr. Anderson's report six days later that she appeared dramatically better. Harrelson notes that fibromyalgia symptoms are known to wax and wane over time.

I acknowledge that the symptoms will change from day to day. In her reconsideration request, however, dated November 14, 2002, Harrelson stated that she could hardly get out of bed and could not move without extreme pain. She does not admit that she has any good days. As is clear from Dr. Anderson's chart note of November 8, 2002, only six days earlier, Harrelson did enjoy some good days. Her appearance was "dramatically better," she was back up to a perfect weight, and "doing a whole lot better" because of the narcotic pain medication. Tr. 260. Harrelson's one-sided description of her symptoms supports the ALJ's reliance on this reason for his credibility determination.

Harrelson disputes the ALJ's reliance on Harrelson's inconsistent reports to the physicians of the number of times she has been arrested for DUI. Harrelson contends that it is unclear if both doctors specifically asked for the total number of arrests, if the question

concerned convictions, or if the topic arose in other ways. The Commissioner contends that there is no indication that Harrelson's reports can be explained in this way.

Dr. Eckstein reported that Harrelson "has had three DUII arrests, the last time being 10 years ago." Tr. 155. Dr. Villanueva stated, "[l]egal history is positive for one DUI, in 1991" and "she was charged with driving under the influence in 1991." Tr. 277, 279.

I find that people without significant experience with the criminal justice system are not careful when speaking to distinguish between an arrest and conviction. It is also not clear what was said to Harrelson to elicit her statements. She may not have been asked to list all arrests and/or convictions during either discussion. Thus, I agree with Harrelson that this inconsistency is not a clear and convincing reason to conclude that she is not credible.

Harrelson disputes the ALJ's reliance on the fact that she did not cooperate with Dr. Villanueva and on a doctor's concern that she was misusing the narcotic pain medication. Harrelson contends that these facts indicate that she was experiencing extreme pain.

Lack of cooperation during an evaluation and efforts to impede accurate testing of limitations are valid reasons to find that a claimant lacks credibility. Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). Even if Harrelson's extreme pain caused her to leave Dr. Villanueva's office without completing the written test, the pain does not explain her inconsistent statements to his staff about the situation or why Harrelson never attempted to reschedule the test. This is a valid reason on which the ALJ could rely.

I do not put any weight on the doctor's concern that Harrelson was misusing the narcotics. Reading the chart notes of her treating physicians, they were concerned about the large doses they were prescribing and were keeping a very close watch on Harrelson's use. They

believed that her misuse at one point, however, was due to a lack of explanation on their part and on confusing information provided by Harrelson's pharmacist. There was no evidence that Harrelson was seeking drugs from other sources or that she was lying to the doctors about the amount she was taking.

Harrelson complains that in assessing her credibility, the ALJ failed to note her limited daily activities, that her complaints to her physicians remained consistent, that stress and activities exacerbated her symptoms, and that her treating physicians prescribed strong narcotic medication to attempt to alleviate her extreme pain.

I do not agree that the chart notes support Harrelson's argument that her complaints to her physicians remained consistent, as explained above. I also note that the ALJ found that although Harrelson reported nausea and fatigue as side effects of her medication, she had not reported the problems to any of her doctors. I do acknowledge that she had cut her daily activities down from an active life including sports and hobbies, volunteer work, and regular church attendance to sporadic church attendance and a single parenting class a week with her daughter. I have considered both the ALJ's reasons and the evidence supporting Harrelson's position. I conclude that the ALJ has stated clear and convincing reasons for finding that Harrelson lacked credibility.

II.     Rejection of Physicians' Opinions

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996). If a treating or examining physician's

opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Lester, 81 F.3d at 830. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. Id. at 831. Opinions of a nonexamining, testifying medical advisor may serve as substantial evidence when they are supported by and are consistent with other evidence in the record. Morgan v. Commissioner of Social Security Administration, 169 F.3d 595, 600 (9th Cir. 1999).

A physician's opinion of disability "premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted." Id. at 602 (internal quotation omitted); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings." Batson v. Barnhart, 359 F.3d 1190, 1195 (9th Cir. 2003).

A. Dr. Eckstein

The ALJ did not accept the assessment of global functioning ("GAF") assigned by Dr. Eckstein, 50,[1] because Harrelson's description of her limitations is not fully credible. The ALJ also noted that Dr. Eckstein relied to a large extent on Harrelson's physical symptoms, which are outside the range of expertise of a psychologist, Dr. Eckstein's specialty.

---

[1] A GAF of 41 to 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, conflicts with peers or co-workers).

Page 12 - OPINION AND ORDER

Harrelson contends that the ALJ improperly rejected Dr. Eckstein's opinion that Harrelson had a GAF of 50. Although Dr. Eckstein did administer the MMPI-2 test to Harrelson, because of the validity profile, she noted that the results should be taken as tentative in nature. The House-Tree-Person Test showed Harrelson to be quite depressed but without any neurological difficulties. The rest of Dr. Eckstein's conclusions were based on Harrelson's self-reports, which the ALJ has properly discounted. I also note that Harrelson's main complaints preventing her from working, as she stated them at her hearing, are the fibromyalgia pain and not any psychological symptoms from which she suffers. I conclude that the ALJ has given clear and convincing reasons for not accepting the GAF level.

Harrelson also contends that, based on Dr. Eckstein's report, Harrelson met the C criteria in the listed impairments.

The Commissioner argues that Dr. Eckstein's notation on a check-box form that Harrelson's depression and anxiety would be likely to increase under stress does not establish that her impairments meet the C criteria of a listed impairment, presumably for an affective disorder. In particular, the Commissioner contends that there is no evidence that Harrelson has a medically documented history of an affective disorder of at least two years duration that caused the required level of symptoms. The Commissioner also argues that Harrelson has not presented a theory of how her impairments meet or equal the listings.

Dr. Eckstein stated on the Rating of Impairment Severity Report:

    5. Is the client demonstrating a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate:

>    Yes [box is checked]
>
>    If Yes, please explain:  Depression & anxiety likely to increase under stress.

Tr. 161.

In her reply, Harrelson clarifies that she is referring to Affective Disorders, 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04C(2), which can be met by:

> C.  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. [decompensation]; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;

I agree with Harrelson that because she does not contend that her impairments *equal* a listing, but instead *meet* them, she does not have to proffer a theory of how the listing is equaled. I agree with the Commissioner, however, that there is no evidence that Harrelson's symptoms have been this severe for at least two years.  I also am not persuaded that Dr. Eckstein's explanation, that depression and anxiety are likely to increase under stress, would be predicted to cause Harrelson to decompensate.  Increased depression and anxiety do not necessarily rise to the level of decompensation.  Without further explanation, this is an inadequate basis for a conclusion that the listing is met.  I also note that the ALJ's reasons for discounting Dr. Eckstein's GAF assessment apply as well to the listing issue.  I conclude that the ALJ gave clear and convincing reasons for failing to adopt Dr. Eckstein's opinion.

B.  Dr. Anderson

Harrelson contends that the ALJ erred by failing to address Dr. Anderson's opinion of March 5, 2003, that "she has significant difficulty with her fibromyalgia for some period of time, which really is significantly disabling for her." Tr. 328.

The Commissioner disputes that Dr. Anderson was giving an opinion in this quoted statement, and interprets it in conjunction with his follow-up letter. On March 25, 2003, 20 days later, Dr. Anderson drafted a "To Whom It May Concern" letter listing Harrelson's diagnoses and stating that she "requires treatment with chronic pain therapy because of the severity of her fibromyalgic syndrome." Tr 316. Dr. Anderson did not put Harrelson under any functional limitations.

I discussed the March 5 chart note to some extent above. When Dr. Anderson made the chart note, he was not addressing a question of whether Harrelson was able to work full or part time. Reading the documents together, I agree with the Commissioner that Dr. Anderson was not giving an opinion which the ALJ should have addressed, but instead was stating that Harrelson's symptoms caused her significant problems, which nobody disputes. That does not mean, however, that she is unable to be in the workplace for an eight hour day or has other limitations which the ALJ failed to address. Dr. Anderson did not give an opinion on this. Thus, the ALJ did not err by failing to address the specific statement.

C.  DDS Doctors

Harrelson argues that the ALJ erred by failing to include in the hypothetical posed to the vocational expert the limitations noted by the DDS doctors.

On March 7, 2003, Dr. Bates-Smith stated that Harrelson would need vocational guidance to set realistic goals in the work place. Tr. 306. The Commissioner contends that this statement is not relevant to whether Harrelson is disabled.

Dr. Bates-Smith made this statement at the end of a list clarifying her assessment of Harrelson's functional capacity. The list also stated that Harrelson could understand and remember simple instructions, could carry out simple instructions and attend to simple tasks for two hour periods throughout a normal eight-hour work day, could get along with coworkers and supervisors, but could have no general public contact. The ALJ included the rest of the list in his hypothetical to the vocational expert.

The phrase "vocational guidance" implies the training for, or selection of, a job rather than supervision while performing a job. The "realistic goals" refers to the types of jobs that would be possible for Harrelson to attempt. I interpret the statement to be Dr. Bates-Smith's opinion that Harrelson would need guidance to determine what types of positions she could perform in consideration of her physical and mental limitations. Accordingly, there was no need to include the statement in the hypothetical.

Dr. Rethinger found that Harrelson needed a "simple routine w/ limited changes in work setting." Tr. 249. The Commissioner contends that the ALJ's finding that Harrelson could not perform detailed or complex work is consistent with Dr. Rethinger's opinion.

The ALJ stated the hypothetical to include: "There are some non-exertional limitations that would limit an individual to simple repetitive type of instructions or job duties. Detail and complex duties or instructions be – to be avoided." Tr. 410. This adequately encompasses the "limited changes in work setting" limitation.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards, and therefore the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

Dated this   23rd   day of January, 2006.

                                               /s/ Garr M. King
                                             Garr M. King
                                             United States District Judge